# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| DICKIE L. BELL,<br><br>      Plaintiff,<br><br>vs.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security,<br><br>      Defendant. | No. C05-4023-MWB<br><br>**REPORT AND RECOMMENDATION** |

_____

## *TABLE OF CONTENTS*

*I.    INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *2*

*II.   PROCEDURAL AND FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . *2*

    *A.    Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . *2*
    *B.    Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*
          *1.    Introductory facts and Bell's hearing testimony* . . . . . . . . . . . *3*
          *2.    Bell's medical history* . . . . . . . . . . . . . . . . . . . . . . . *7*
          *3.    Vocational expert's testimony* . . . . . . . . . . . . . . . . . . . *10*
          *4.    The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . *12*

*III.  DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND*
*      THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . . *13*

    *A.    Disability Determinations and the Burden of Proof* . . . . . . . . . . . *13*
    *B.    The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . *16*

*IV.  ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *19*

*V.   CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *20*

## I. INTRODUCTION

The plaintiff Dickie L. Bell ("Bell") appeals a decision by an administrative law judge ("ALJ") denying his application for Title II disability insurance ("DI') benefits. Bell claims the ALJ erred in finding he engaged in substantial gainful activity after his alleged disability onset date, and in finding he retains the residual functional capacity to return to his past relevant work. (*See* Doc. No. 8)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On March 20, 2002, Bell filed an application for DI benefits, alleging a disability onset date of February 18, 2002. (R. 49-51) Bell alleged he was disabled due to diabetes, hypertension, and a heart attack, rendering him unable to "exert at all." (R. 120) His application and request for reconsideration were denied. (R. 37-41, 44-46)

Bell requested a hearing (*see* R. 47-48), and a hearing was held before ALJ John P. Johnson on July 13, 2004, in Des Moines, Iowa. (R. 292-327) Bell was represented at the hearing by attorney David Vohs. Bell testified at the hearing, and Vocational Expert ("VE") Julie Svec also testified.

On September 24, 2004, the ALJ ruled Bell was not entitled to benefits. (R.18-28) Bell appealed the ALJ's ruling, and on February 11, 2005, the Appeals Council denied Bell's request for review (R. 5-7), making the ALJ's decision the final decision of the Commissioner.

Bell filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) In accordance with Administrative Order #1447, dated September 20, 1999, this matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), for the filing of a report and recommended

disposition of Bell's claim. Bell filed a brief supporting his claim on May 10, 2005. (Doc. No. 8) The Commissioner filed a responsive brief on June 24, 2005 (Doc. No. 9) The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Bell's claim for benefits.

### B. Factual Background

*1. Introductory facts and Bell's hearing testimony*

At the time of the hearing, Bell was 64 years old. He lived in a single-family house in Sioux City, Iowa, with his wife. He was 6'1" tall and weighed 255 pounds, which he stated was his normal weight. He has an unrestricted driver's license and does his own driving. (R. 296-97, 310)

Bell graduated from high school in 1958, and then completed two years of college, studying business administration. He served in the military as an infantry squad leader.

On Bell's alleged disability date of February 18, 2002, he was working at Mark's Truck Trailer Sales, where he sold semi-trucks and trailers. Bell worked at the truck dealership from August 1, 1985, to February 18, 2002. (R. 140, 298-99) In addition to working at Mark's, Bell also owned his own business which "involved the buying and selling of truck trailers." (R. 299) Bell described his job as involving very little office time. His primary function "was to go out and contact the customers." (*Id.*) For his own business, he would go out and inspect trucks and trailers to see if he wanted to buy them. (R. 300) The heaviest thing he had to lift on the job was a sales manual that weighed less than ten pounds. He used a typewriter and a computer to prepare reports and do paperwork. (R. 301)

Since his alleged disability onset date, Bell has continued to sell used trailers in his own business. The sales are primarily seasonal, although he will have some sales

throughout the year. He estimated he works only "half the day here and there" because he fatigues easily. (R. 301-02) In 2002, Bell reported income from his business of $14,417, plus a commission or officer's salary of $1,000. The same year, Bell earned about $6,000 from Mark's. Bell estimated that about 65% of his income for 2002 represented work he did prior to his heart attack on February 18, 2002. Most of his sales after his heart attack were secured by contacts he had made and orders that were placed prior to his heart attack. (R. 302, 312-13)

In 2003, he again earned a $1,000 officer's salary from his business, but his business reported an overall loss of $6,753. (R. 302) He earned $4,455 from Mark's in 2003. He worked for Mark's until August 30, 2003, but he was on a restricted work schedule because of his health problems. (R. 303, 313)

Bell suffered a heart attack on February 18, 2002, while he was working for Mark's. He was diagnosed at a hospital in West Point, Nebraska, and he was airlifted to Sioux City, where he underwent an angiogram and placement of a stent in one vessel. He was sent home to recover for several weeks, and then he underwent a quadruple bypass on April 1, 2002. Bell feels he has never completely recovered from the bypass surgery. He attended four weeks of cardiac rehabilitation, but he still experiences pressure in his chest, for which he takes a nitroglycerin pill. He stated the pressure may occur up to three times in one day, and then may not occur again for several days. He has not noticed any type of pattern or precipitating event that brings on the chest pressure. (R. 303-04)

Bell sees a cardiologist twice a year, a pulmonary specialist, a family doctor, a doctor who treats his diabetes, and an eye doctor for his glaucoma. He stated his glaucoma is treated with eye drops. He takes a number of medications, but he denied adverse side effects from his medications. (R. 304-05)

4

Bell estimated he could walk only about half a block when the humidity is high, but in a "normal situation," he could walk about two blocks, which would take him ten minutes due to shortness of breath. He estimated he can stand for five to seven minutes at a time before he has to sit down because his back will bother him. Because of his shortness of breath, he must climb stairs very slowly, or stop halfway up to rest. (R. 305-06) Bell's attorney noted Bell had told one of his doctors previously that he could walk up to two miles at a time. Bell explained that was prior to the onset of his lung problems, which were diagnosed in March or April of 2002. (R. 315-16)

According to Bell, doctors removed a vein from his right leg during his surgery, and he continues to have numbness in his right leg. If he squats, he requires assistance or has to use a countertop or a chair to get back up again. He no longer kneels at church because of the numbness in his right leg. He has no problems using his hands, and estimated he can lift between ten and twenty pounds. He is able to sit for no longer than ten to fifteen minutes at a time because his right leg will bother him. Bell estimated that in an eight-hour day, he could be up on his feet, either walking or standing, for perhaps a total of two-and-a-half hours. He stated he would sit for short periods, move around for short periods, and rest. He has problems reaching over his head with his left arm because the left side of his chest is numb since his surgery. He has difficulty pulling steadily with his left arm, as well. He is able to drive without difficulty. (R. 307-08)

Bell stated his symptoms worsen when he is exposed to cold, heat, and humidity. (R. 308) According to Bell, his doctors have told him he has only 51% of his lung capacity, and he should not be outside when the temperature is under 30 degrees or over 75 degrees, or the humidity is over 65%. (R. 314) Bell and his attorney prepared an exhibit (*see* R. 176-211) showing climatological data in the Sioux City, Iowa, area from May 2002 through October 2003, indicating that based on temperature alone, there were

5

272 out of 550 days when Bell could not be outside because the temperature fell outside the range approved by his doctor. (R. 314-15)

Bell's has vision problems in his right eye due to either his glaucoma or his diabetes. He wears glasses that correct his vision. (R. 309)

Bell stated his wife works as a secretary for a high school principal, and she is one year from retirement. Bell receives Social Security retirement benefits of $1,383 per month, and his medications and medical treatment are covered through the Veterans Administration. (*Id.*)

Bell has difficulty sleeping at times, when he might be up at 4:00 a.m., but on an average day, he gets up at 7:00 a.m. He goes to bed at night anywhere from 8:30 p.m. to 10:30 p.m. His sleep problems are due to the numbness in his right leg and his chest. He has no problems caring for himself. When he arises, he eats breakfast, takes a shower, dresses, and reads the paper. If the weather is nice, he may go out and call on some customers during the morning. He may spend up to 60% of the day calling on customers, if the weather is not bothering him. He spends the remainder of the day resting, generally laying down on the sofa and reading or watching television. After supper, he again will read or watch television. (R. 309-11) He stated that due to his wife's medical condition (which he did not specify), he does "most of the cooking and the dishes and also the laundry and ironing." (R. 312)

Bell enjoys building miniature airplanes. He stated he used to play racquetball but he cannot play any longer. He belongs to the VFW and the Elk's Club, but he stated he has not attended a function at either place for over two years. (R. 311) He plays nine holes of golf a couple of times a week, weather permitting. He rides in a cart when he plays. (R. 316)

6

## 2. *Bell's medical history*

The record reflects that Bell went to the emergency room in West Point, Nebraska, on February 18, 2002, complaining of chest and tooth pain. (R. 213) Examination findings "included electrocardiographic evidence of anterior ST segment depressions." (R. 215) He was transported to Mercy Medical Center in Sioux City, Iowa, where testing indicated three-vessel coronary artery disease. He underwent percutaneous transluminal coronary angioplasty and placement of a stent in one vessel, with recommendation that he undergo coronary artery bypass surgery. (R. 216-18) On April 1, 2002, Bell underwent coronary artery bypass grafting to treat "his triple vessel coronary artery disease." (R. 226; *see* R. 223-31) At a follow-up exam on April 23, 2002, Bell was doing well, and denied any chest pain or shortness of breath. (R. 232)

Bell underwent a treadmill test on June 12, 2002, during which he exhibited exertional shortness of breath, but no chest discomfort at the level of exercise he was able to achieve. (R. 233) An x-ray of Bell's chest on that date indicated his lungs were well expanded and clear. (R. 235)

Bell was examined again on July 18, 2002. R. 236-39) He reported increased problems with his breathing, general shortness of breath, and "early fatigability." (R. 236) J.S. Burgfechtel, M.D. opined the breathing problems could be due to the Beta blockers prescribed after Bell's bypass surgery. (*Id.*) On examination, Bell exhibited some decreased sensation in his medial calf and foot on the right, and in his left anterior chest wall. Range of motion testing showed Bell to have "a moderately stiffened cervical spine, mild to moderate stiffness and mild crepitus of both shoulders, some decreased range of motion of his right hip, decreased forward flexion of his lumbar spine[, and] . . . some mild subpatellar grating of his knees, but no effusion or instability." (R. 237)

Bell estimated he could walk "about two miles at a relatively slow pace." (*Id.*) He estimated he could lift and carry 20 to 30 pounds occasionally. He could stand, move about, walk, and sit, but reported that "warm, humid or unconditioned areas, especially in summer time, may bother him." (*Id.*) He exhibited difficulty squatting, but he was able to get down on his hands and knees and then get back up again. He evidenced no impairment of his ability to handle objects, see, hear, speak, or travel. Dr. Burgfechtel opined Bell could tolerate stooping and climbing "marginally," and he should avoid extreme temperatures, humidity, and hazards. The doctor expected some of Bell's symptoms to improve "with continued pulmonary treatment, perhaps adjustment of his cardiac medication in terms of his dyspnea." (*Id.*) The doctor further noted Bell "does have some chronic osteoarthritic findings which basically he was tolerating in his prior line of work, but is otherwise doubtful that he could do that much more than he was doing in the past." (*Id.*)

Bell saw Allan S. Manalan, M.D. on August 5, 2002, for follow-up of his heart condition. Bell appeared to be stable from a cardiac standpoint, but complained of generalized fatigue and shortness of breath upon even limited exertion. Pulmonary evaluation disclosed evidence of chronic obstructive pulmonary disease, but despite medication adjustments, Bell continued to experience "fatigue and a generalized impaired sense of well being." (R. 240) The doctor opined this could be due to "CNS intolerance to even low dose beta blocker therapy." (R. 241) He changed Bell's medications, with a plan to contact Bell in two weeks to assess his response to the adjustment. (*Id.*)

On August 14, 2002, Lawrence F. Staples, M.D. reviewed Bell's records and completed a Residual Functional Capacity Assessment form. (R. 245-54) He opined Bell would be able to lift twenty pounds occasionally and ten pounds frequently; stand, walk, and sit for about six hours in an eight-hour workday; and push/pull without limitation. He

8

opined Bell could do balancing activities frequently, and all other postural activities occasionally, and Bell should avoid concentrated exposure to extreme heat or cold, and to fumes, odors, dusts, and other airborne contaminants. (*Id.*) John A. May, M.D. reviewed the record on December 21, 2002, and concurred in Dr. Staples's opinion. (R. 252)

Bell was seen by pulmonary specialist Craig W. Bainbridge, M.D. on September 25, 2002. In July 2002, Dr. Bainbridge had prescribed inhalers for Bell (*see* R. 255-60), and at this visit, Bell reported the inhalers had not helped him much. The doctor noted, "Since [Bell is] not getting much relief from either inhaled corticosteroids or sympathomimetics, I think we should simply sit tight. He can do pretty much what he wants to do." (R. 255) On October 18, 2002, Dr. Bainbridge opined Bell could "walk two hundred feet without stopping to rest." (R. 261) Dr. Bainbridge wrote an opinion letter dated February 21, 2003, in which he stated Bell has "significant obstructive airways disease which is exacerbated by extremes of temperature," and he recommended Bell "avoid high humidity, extreme heat or cold." (R. 271)

On October 25, 2002, Bell saw S.K. VandeVegte, D.O. "for follow-up of chronic medical problems." (R. 262) Bell continued to report ongoing shortness of breath with ambulation. He admitted he was not always following his diabetic diet as well as he should. His blood pressure was somewhat elevated, and the doctor increased Bell's medication dosage. Testing also indicated Bell's lipid levels were too high, and the doctor prescribed Simvastatin. (R. 262) On March 28, 2003, Dr. VandeVegte wrote a letter in which she opined Bell should avoid humidity over 60%, and limit his activities when temperatures are below 30 or above 85 degrees. The doctor stated, "Activities outside of these parameters are likely to cause significant shortness of breath, which would be a strain on both [Bell's] heart and lungs." (R. 272)

9

Bell was seen at the Veterans Administration Medical Center ("VA") in Sioux Falls, South Dakota, on October 29, 2002. He complained of having low energy, and stated he was working two to two-and-a-half hours daily. His current diagnoses were glaucoma, gout, hypertension, and diabetes mellitus Type II. Notes indicate he was on an Advair inhaler, and he was started on flunisolide, and Serevent for nighttime cough. (R. 283-84) He was seen at the VA for follow-up on November 1, 2002, complaining of blurry vision in his left eye with headache. (R. 286) He was scheduled for an eye examination. (*Id.*)

Bell was seen in the optometry clinic at the VA on July 30, 2003. His lens prescription and his eye drops were changed. He was advised to return for follow-up in six months. (R. 287) At a follow-up visit on February 4, 2004, Bell exhibited intraocular pressure ("IOP") that was "borderline high." (R. 290) He was advised to discontinue his eye drops for thirty-six hours, and to return in one month for recheck. (R. 280) At a follow-up visit on March 3, 2004, his IOP was still considered borderline, but improved. (R. 290-91)

### 3. *Vocational expert's testimony*

The ALJ asked VE Julie Svec the following hypothetical question:

> My first assumption is that we have an individual who is 64 years old. He was 62 years old as of the alleged onset date of disability. He's a male. He has a high school education plus two years of college. He has past relevant work as you've indicated in [the work summary] and he has the following impairments. He has coronary artery disease, status post coronary artery bypass graft, chronic obstructive pulmonary disease, diabetes mellitus, hypertension, hyperlipidemia. He has a history of gout. He has a history of bursitis or arthritis of the shoulders and a history of arthritis of the lower back and knee. And as a result of a combination of those impairments

> he has the residual functional capacity as follows. He cannot lift more than 20 to 30 pounds, routinely lift 10 pounds. He cannot – or standing and walking is limited to six hours out of an eight-hour day. He cannot continuously stoop or more than occasionally squat, kneel, crawl or climb. This individual should not be exposed to excessive heat, humidity or cold or more than moderate levels of dust. Should not work at unprotected heights. Would this individual be able to perform any job he previously worked at either as he performed it or as it is generally performed within the national economy and if so, would you please specify which job?

(R. 319-20) The VE opined the individual would be able to return to Bell's past work as a sales representative.

The ALJ then asked a second hypothetical question, as follows:

> My next hypothetical would be an individual of the same age, sex, education, past relevant work and impairments as previously specified. And this would be an individual who would have the residual functional capacity as follows. This individual could not lift more than 10 to 20 pounds. Routinely lift ten pounds with no standing of more than five to seven minutes at a time. No sitting of more than 10 to 15 minutes at a time and no walking of more than 2 blocks at a time, with only occasional squatting, kneeling, crawling or climbing. Only occasional work with the left arm overhead. This individual should not be exposed to excessive heat, humidity or cold or more than moderate levels of dust or fumes. Would this individual be able to perform any job he previously worked at either as he performed it or as it is generally performed within the national economy?

(R. 320-21) The VE replied that if the individual could only stand for five to seven minutes at one time, and sit for ten to fifteen minutes at one time, he would not be able to return to Bell's past relevant work. However, she opined the individual would have transferable skills, including "his persuasive skills, the ability to document clearly, his

11

general knowledge of trucks, trailers, the ability to organize and assimilate information, ability to estimate cost and prices and the ability to operate a computer keyboard." (R. 321) The VE opined there would be little adjustment required for the individual to transfer his acquired skills to jobs such as repair order clerk, service clerk, or delivery pricer. (R. 322) On questioning by Bell's attorney, the VE clarified that she was assuming the listed jobs would be performed indoors. She was not considering the exposure to heat, cold, or humidity that could occur during transit from home to office. (R. 324-25)

### *4. The ALJ's decision*

The ALJ found Bell has engaged in substantial gainful activity since his alleged disability onset date, he retains the residual functional capacity to return to his past relevant work as a truck salesman, and he therefore is not disabled. (R. 22-23, 26-27) He found Bell suffers from severe impairments consisting of "coronary artery disease, status post coronary artery bypass grafting; chronic obstructive pulmonary disease; diabetes mellitus; hypertension; hyperlipidemia; a history of gout; a history of bursitis or arthritis of the shoulders; glaucoma; and a history of lower back and knee problems"; however, he further found Bell's impairments, either singly or taken together, do not meet the regulatory requirements for disability. (R. 27, ¶¶ 3 & 4)

The ALJ found Bell's statements concerning the degree of his limitations were "not totally credible in light of the reports of the treating and examining practitioners, discrepancies between [Bell's] assertions regarding the severity of his symptoms and limitations and information contained in the reports regarding medical signs and findings, frequency of treatment, and daily activities which are inconsistent with [his] allegation of disability." (R. 26)

## III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(I).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). The United States Supreme Court has explained:

> The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." . . . Such abilities and aptitudes include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling"; "[c]apacities for seeing, hearing, and speaking"; "[u]nderstanding, carrying out and remembering simple instructions"; "[u]se of judgment"; "[r]esponding appropriately to supervision, co-workers, and usual work situations"; and "[d]ealing with changes in a routine work setting."

*Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b)).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon*, *supra*. The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical

history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 421 F.3d at 790 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. *The Substantial Evidence Standard*

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d 1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999)); *accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration of the record in its entirety, taking into account both "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at 1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir.

1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456, 464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796*; Hutton*, 175 F.3d at 654 (citing *Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health & Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S. 91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.* (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier,* 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 421 F.3d at 789 ("[A]n administrative decision is not subject

to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d. 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)). As the court explained in *Polaski v. Heckler:*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
> 2) the duration, frequency and intensity of the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects of medication;
> 5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984). *Accord Ramirez v. Barnhart*, 292 F.3d 576, 580-81 (8th Cir. 2002).

## IV. ANALYSIS

Bell first argues the ALJ erred in finding he engaged in substantial gainful activity since his alleged disability onset date. He claims his part-time, self-employed work did not constitute substantial gainful activity, and the ALJ misinterpreted his tax returns in finding otherwise. (Doc. No. 8, p. 3) He argues further that his "actual Social Security wages" as evidenced by the record differ from the ALJ's findings. (*Id.*, p. 4)

The Commissioner argues the ALJ's conclusion is correct under the three regulatory tests for determining whether a self-employed individual has engaged in substantial gainful activity. (Doc. No. 9, pp. 9-10, citing 20 C.F.R. § 404.1575) In her brief, the Commissioner discusses the three tests in detail as applied to the evidence of record. The undersigned finds the Commissioner's reasoning to be persuasive and concurs in the ALJ's determination that Bell engaged in substantial gainful activity after his alleged disability onset date, at least for calendar year 2002.

Bell further argues the ALJ erred in finding he retains the residual functional capacity to perform his past work. He claims the ALJ ignored his testimony regarding his restrictions, which he argues is supported by the medical evidence. (Doc. No. 8, pp. 7-8) The court does not agree. Indeed, the court finds the ALJ properly concluded Bell remains able to work at his prior occupation, or in the alternative, at any of the other occupations identified by the VE. The court further finds the ALJ presented a proper hypothetical to the VE based on the limitations he found to be credible, and the ALJ's credibility determination is supported by the record.

In summary, the court finds the record contains substantial evidence to support the ALJ's decision.

## V. CONCLUSION

For the reasons discussed above, **IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections[1] to the Report and Recommendation in accordance with 28 U.S.C. § 636 (b)(1)(C) and Fed. R. Civ. P. 72(b), within ten (10) days of the service of a copy of this Report and Recommendation, that the Commissioner's decision be affirmed.

**IT IS SO ORDERED.**

**DATED** this 5th day of December, 2005.

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

---

[1] Objections must specify the parts of the report and recommendation to which objections are made. Objections must specify the parts of the record, including exhibits and transcript lines, which form the basis for such objections. *See* Fed. R. Civ. P. 72. Failure to file timely objections may result in waiver of the right to appeal questions of fact. *See Thomas v. Arn*, 474 U.S. 140, 155, 106 S. Ct. 466, 475, 88 L. Ed. 2d 435 (1985); *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).